UNITED STATES of America, Plaintiff,

v.

(1) Melvin KAMINS, (6) Reuben Sturman, Defendants.

Crim. No. 78–208.

United States District Court, W. D. Pennsylvania.

Nov. 30, 1979.

Robert J. Cindrich, U. S. Atty., Pittsburgh, Pa., for plaintiff.

Herald Price Fahringer, New York City, Bernard A. Berkman, Cleveland, Ohio, for defendants.

## OPINION

COHILL, District Judge.

The deceptively narrow question before us today requires this Court to juggle the concepts of double jeopardy, conspiracy, and obscenity—each a nebulous circle in itself—while at the same time attempting to balance the government's interest in prosecuting alleged crimes against the constitutional rights of the defendants not "to be twice put in jeopardy." In attempting to achieve some equilibrium, we will rely heavily on the facts of record before us, which are tangible and therefore more manageable, and on the significant appellate decisions in these three areas.

Reuben Sturman and Melvin Kamins are two of six defendants charged in an indictment brought in the Western District of Pennsylvania with 15 substantive violations of 18 U.S.C. § 1462 (1976) (interstate transportation of obscene magazines and motion pictures) and one count of conspiracy to transport obscene materials interstate under 18 U.S.C. § 371 (1976). Only defendants Sturman and Kamins and only the conspiracy count are before us today. In 1978 these two defendants, among others, were tried in the United States District Court for the Northern District of Ohio on a multiple-count indictment including a charge of conspiracy to disseminate obscene materials interstate. At the conclusion of a lengthy trial, both defendants were acquitted on all counts by the jury. They have moved this Court to dismiss the current conspiracy count as to them on the basis of double jeopardy.

Both the government and defendants have agreed that the double jeopardy motion should be isolated from the defendants' "omnibus pretrial motions" and be considered first because our ruling will be appealable prior to trial. *Abney v. United States*, 431 U.S. 651, 97 S.Ct. 2034, 52 L.Ed.2d 651 (1977); *United States v. Inmon*, 568 F.2d 326, 328 (3d Cir. 1977).

Sturman and Kamins argue that the prior acquittal of conspiracy bars reprosecution on the same charge. The government responds that where a current indictment charges a separate offense than was previously adjudicated the double jeopardy protection is inapplicable. Theoretically, both parties are correct. The more precise task before us is defining the legal theory required by this set of facts. The entire transcript of the prior trial as well as the prior indictment have been made part of the record before us.

*Double Jeopardy*

The Fifth Amendment to the United States Constitution includes this guarantee:

[N]or shall any person be subject for the same offense to be twice put in jeopardy . . .

This basic guarantee was imported as a part of our common law heritage. As the Supreme Court explained in an early case, "[i]f there is anything settled in the jurisprudence of England and America, it is that no man can be twice lawfully punished for the same offense." *Ex parte Lange*, 85 U.S. (18 Wall.) 163, 168, 21 L.Ed. 872 (1874). Defining what constitutes the "same offense" has not been an easy task for courts or commentators.[1]

In 1970 the Supreme Court of the United States decided *Ashe v. Swenson*, 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970), holding that the civil concept of collateral estoppel—issue preclusion—is an inherent ingredient of the Fifth Amendment double jeopardy guarantee. There the defendant had been indicted for his alleged participation in a robbery of six men who had been playing poker. After a jury acquitted him of the robbery of one of the men, the state prosecuted him again for the robbery of another of the victims. Although disagreeing on several aspects of the definition of the "same offense" for double jeopardy purposes,[2] seven members of the Court agreed that the general verdict of acquittal after the first trial resolved the issue of the defendant's participation in the robbery and precluded that issue from being litigated a second time. Justice Stewart wrote for the majority:

"Collateral estoppel" is an awkward phrase, but it stands for an extremely important principle in our adversary system of justice. It means simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit. Although first developed in civil litigation, collateral estoppel has been an established rule of federal criminal law [for] at least . . . 50 years . . . As Mr. Justice Holmes put the matter in [*United States v. Oppenheimer*, 242 U.S. 85, 37 S.Ct. 68, 61 L.Ed. 1916], "It cannot be that the safeguards of the person, so often and so rightly mentioned with solemn reverence, are less than those that protect from a liability in debt."

397 U.S. at 443, 90 S.Ct. at 1194 (citations omitted).

Turning to the application of this rule, Justice Stewart added:

The federal decisions have made clear that the rule of collateral estoppel in criminal cases is not to be applied with the hypertechnical and archaic approach of a 19th century pleading book, but with realism and rationality. Where a previous judgment of acquittal was based upon a general verdict, as is usually the case, this approach requires a court to "examine the record of a prior proceeding, taking into account the pleadings, evidence, charge, and other relevant matter, and conclude whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration." The inquiry "must be set in a practical frame and viewed with an eye to all the circumstances of the proceedings." Any test more technically restrictive would, of course, simply amount to a rejection of the rule of collateral estoppel in criminal proceedings, at least in every case where the first judgment was based upon a general verdict of acquittal.

397 U.S. at 443–44, 90 S.Ct. at 1194 (citation omitted).

1. *See United States v. Cioffi*, 487 F.2d 492, 496–97 (2d Cir. 1973) (Friendly, J.); *cert. denied*, 416 U.S. 995, 94 S.Ct. 2410, 40 L.Ed.2d 774 (1974); *United States v. Fusco*, 427 F.2d 361, 362 (7th Cir. 1970). *See also* cases collected at J. Cook, Constitutional Rights of the Accused—Post-trial Rights § 63 (1976); Haddad & Murlock, "Double Jeopardy Problems and the Definition of the Same Offense," 22 U.Fla. L.Rev. 515 (1970).

2. Although a majority of the court agreed on the result, there were four separate opinions explaining the rationale for the holding.

Many decisions since *Ashe* have attempted to apply the collateral estoppel principle in cases where the facts have been less graphic. *E. g., United States v. Venable*, 585 F.2d 71 (3d Cir. 1978) (trial on a false statements count was not barred by a prior acquittal of an extortion count where the acquittal was clearly based on the government's failure to establish dates of the alleged extortion payments); *United States v. Nelson*, 574 F.2d 277 (5th Cir. 1978), *cert. denied*, 99 S.Ct. 355 (1979) (where a jury acquitted defendant of a charge of using a gun during the commission of a felony, he could not be retried on a charge of putting lives in jeopardy with a dangerous weapon during commission of a bank robbery); *United States v. Hernandez*, 572 F.2d 218 (9th Cir. 1978) (perjury trial foreclosed by prior acquittal of false statements charge where the defendant's truthfulness in the subject episode was necessarily decided by the false statements acquittal); *United States v. Barket*, 530 F.2d 181 (8th Cir. 1976), *cert. denied*, 429 U.S. 917, 97 S.Ct. 308, 50 L.Ed.2d 282 (1976) (bank officer's acquittal of willful misapplication of funds did not bar prosecution for violation of campaign contribution statute involving same funds where the two crimes were distinct and separate offenses). These and other cases stress that the double jeopardy decision turns not on the nature of the charges alone, but also on what actually transpired at the first trial. Courts have asked themselves whether factfindings favorable to the defendant were necessarily part of the jury's verdict or whether a first jury implicitly acquitted a defendant of later charges, *Hardwick v. Doolittle*, 558 F.2d 292, 298 (5th Cir. 1977), *cert. denied*, 434 U.S. 1049, 98 S.Ct. 897, 54 L.Ed.2d 801 (1978); whether previously decided facts or resolved issues are to be litigated anew, *Venable, supra*, 585 F.2d at 77–78; *United States v. Pappas*, 445 F.2d 1194 (3d Cir. 1971), *cert. denied*, 404 U.S. 984, 92 S.Ct. 449, 30 L.Ed.2d 368 (1971); *United States v. Nash*, 447 F.2d 1382 1384 (4th Cir. 1971); and what facts, arguments of counsel, and rulings of the trial judge influenced the earlier acquittal, *Barket, supra; Hutchings v. Estelle*, 564 F.2d 713 (5th Cir. 1977). But a district court has warned against conjecture about the jury's reasoning. *Jones v. Blankenship*, 458 F.Supp. 521, 524–25 (W.D.Va. 1978).

A Florida district court succinctly stated the rule of *Ashe* and its progeny in *United States v. Gurney*, 418 F.Supp. 1265, 1268 (M.D.Fla.1976); there Chief Judge Young wrote,

> [w]hile the Government may charge, try and convict a defendant with more than one charge growing out of the same transaction, it may not in a second trial relitigate an issue of either ultimate fact or evidentiary fact upon which the defendant was acquitted in an earlier trial.

■ In a thoughtful recent opinion, the Ninth Circuit adopted a three-step analysis to determine whether the collateral estoppel principle of double jeopardy applies in a given case:

> (1) An identification of the issues in the two actions for the purpose of determining whether the issues are sufficiently similar and sufficiently material in both actions to justify invoking the doctrine; (2) an examination of the record of the prior case to decide whether the issue was "litigated" in the first case; and (3) an examination of the record of the prior proceeding to ascertain whether the issue was necessarily decided in the first case.

*Hernandez, supra*, 572 F.2d at 220. This analysis synthesizes the holdings we have reviewed. We will adopt this process in making our independent review.

Several cases, including some in the Third Circuit, have placed on the defendant the burden of persuasion to convince courts that double jeopardy applies. *Barket, supra*, 530 F.2d at 188; *United States v. Manuszak*, 532 F.2d 311, 315 (3d Cir. 1976).

*Conspiracy—Double Jeopardy*

The double jeopardy question here is complicated by the fact that both the prior acquittal and the instant indictment involve a charge of conspiracy. Although we find *Ashe* applicable, and *Hernandez* helpful, we cannot yet turn to the facts of this case without noting the emergence of a separate

line of cases, with more specific rules, where the double jeopardy challenge attacks a count of conspiracy.

In *United States v. Inmon,* 568 F.2d 326 (3d Cir. 1977), a case originating in this Court before this judge, the defendant moved to dismiss a conspiracy charge in an indictment on double jeopardy grounds. The indictment charged a conspiracy to distribute and possess with intent to distribute heroin; the defendant argued that he was being charged with the same conspiracy he had pleaded guilty to on an earlier indictment. The United States Court of Appeals for the Third Circuit held that once a defendant has presented a *prima facie,* nonfrivolous claim of double jeopardy, the burden of persuasion on the issue, by a preponderance of the evidence, shifts to the government. The Court reasoned that the government's greater access to proof and the prosecutorial control over the particularity of the charges justified placing the burden for differentiating the indictments on the government. *See also United States v. Mallah,* 503 F.2d 971 (2d Cir. 1974) *cert. denied,* 420 U.S. 995, 95 S.Ct. 1425, 43 L.Ed.2d 671 (1975). The Fifth Circuit has recently adopted the *Inmon* holding, stating, "[w]e agree, for similar reasons, that the burden of establishing that the indictments charge separate crimes is most equitably placed on the government when a defendant has made a nonfrivolous showing that an indictment charges the same offense as that for which he was formerly placed in jeopardy." *United States v. Stricklin,* 591 F.2d 1112, 1118 (5th Cir. 1979), *reh. denied,* 598 F.2d 620 (5th Cir. 1979), *cert. denied,* —— U.S. ——, 100 S.Ct. 449, 62 L.Ed.2d 375 (1979).

Both *Inmon* and *Stricklin* have held that the government's burden in overlapping conspiracy cases is to establish by a preponderance of the evidence to the satisfaction of the Court that the crime presently charged is not the crime in the previous indictment which resulted in a guilty plea or a conviction. 568 F.2d at 332, 591 F.2d 1118, 1121. The *Stricklin* court noted the difficulty of applying double jeopardy principles where the crimes charged are "complicated or far-reaching conspiracies," 591

F.2d at 1117, and noted how the parties would be likely to reverse their normal trial stances for the double jeopardy claim:

> In the double jeopardy context, the position of the parties is reversed from that usually taken in trials of conspiracy cases. In the latter, it is usually the government's position that all similar conduct proven is part of one far-reaching conspiracy. The defendant generally asserts that, if conspiracy be shown at all, his activity was separate from, and not connected with, the conspiracy charged.
>
> In the dispute over double jeopardy, however, it is the defendant who asserts that the earlier indictment was sufficiently broad to encompass all of his conduct, and the government asserts the narrow, limited scope of its earlier indictment. . . . This conflict sufficiently demonstrates the need for care and definition in the drawing of indictments in conspiracy cases.

591 F.2d at 1121.

Several very recent circuit opinions have scrutinized conspiracies to determine if "the same offense" rationale of the double jeopardy provision was logically applicable. These decisions have stressed the nature of the offense—an unlawful agreement—and have attempted to draw the factual boundaries of the agreement by reference to the indictment and the evidence adduced before the grand jury or at trial. In *United States v. DeFillipo,* 590 F.2d 1228 (2d Cir. 1979), cert. denied, —— U.S. ——, 99 S.Ct. 2844, 61 L.Ed.2d 288 (1979), the Second Circuit considered the double jeopardy claim of two defendants who were convicted of a 1974 conspiracy to possess stolen suits and then later convicted of a 1975 conspiracy to possess stolen shaving products. Because both criminal episodes involved hijackings of trailer trucks and because the government requested the admission at the second trial of the prior conviction as evidence of a common scheme or plan, the defendants argued that the second offense was part of a continuing conspiracy that had been the subject of the first trial. The Second Circuit rejected this assertion, finding that the government's charges were narrowly drawn

("carefully limited in time and place"), that there was no overlap of dates, and that there was no indication in the record of a continuing conspiracy to commit separate hijackings. The Court also noted a difference between the offense in this case, conspiring to receive stolen goods via an interstate hijacking, and the type of conspiracy involved in a narcotics case; in the latter, the nature of the enterprise is "continuous." Since there was no evidence of direction by a "criminal syndicate" in *DeFillipo*, the court concluded that there had been one agreement to hijack one truck followed by a separate agreement to hijack another. 590 F.2d at 1235.

The DeFillipo court thus distinguished the oftcited case of *United States v. Mallah*, 503 F.2d 971 (2d Cir. 1974), *cert. denied*, 420 U.S. 995, 95 S.Ct. 1425, 43 L.Ed.2d 671 (1975), where the Second Circuit overturned on double jeopardy grounds a conviction of conspiracy to distribute narcotics. The *Mallah* court took notice that a drug conspiracy is often structurally much like a large business venture. The court thus rejected the "same evidence" test which would have required it to examine and compare the overt acts of the indictment:

> The essence of the charge is the criminal agreement to merchandise narcotics. The same agreement may be established by different aggregations of proof . . . because there are no doubt many overt acts which the government might have charged, a test measuring only overt acts provides no protection against carving one larger conspiracy into smaller separate agreements.

503 F.2d at 985. After reviewing essential facts of the two conspiracies—the same general locale and time frame, personnel, methods, and purposes—and the failure of the government to define in either instance the geographical scope of the conspiracies, the court concluded that the government had failed to rebut the presumption raised by the defendant that there was one conspiracy. "[G]iven the broad definition of narcotics conspiracy adopted in our cases, and recognizing that the task of defining the scope of these conspiracies is somewhat akin to describing an elephant from touch,"

the court would not allow the second conviction to stand. 503 F.2d at 987.

Another of the more recent cases, *United States v. Guido*, 597 F.2d 194 (9th Cir. 1979), reached the same result as *Mallah* in comparing drug conspiracies despite a time lapse and differences in the participants. Reversing a district court finding of separate conspiracies, the Ninth Circuit found that the two conspiracies involved the same objective to import and distribute large quantities of marijuana, the same key participants or "masterminds," the same source, the same means of transportation, the same importation and distribution points, and one two-year period of time despite a lull in drug deliveries between the first and second alleged conspiracies. Under these circumstances the court of appeals found it hard to escape the conclusion that there had been only one continuing conspiracy.

Similarly, in *United States v. Tercero*, 580 F.2d 312 (8th Cir. 1978), the Eighth Circuit found two alleged drug conspiracies to constitute only one offense. The "proper test" advocated by that court was "whether the totality of the circumstances demonstrate that the two alleged conspiracies are in reality part of a single conspiracy." 580 F.2d at 315. The Eighth Circuit examined the grand jury testimony behind each indictment as well as the indictments themselves and concluded that in each case the "indictments artificially circumscribe[d] the conspiracy." *Id.* The overlap and interrelationship among personnel, the similar methods of operation, the similar time frame, and the immense quantities of drugs involved compelled the conclusion that in reality one single conspiracy had existed. *See also United States v. Honneus*, 508 F.2d 566 (1st Cir. 1974), *cert. denied*, 421 U.S. 948, 95 S.Ct. 1677, 44 L.Ed.2d 101 (1975) and *United States v. Young*, 503 F.2d 1072 (3d Cir. 1974) (where a single agreement violates two statutes, only one conspiracy may be punished); *United States v. Adcock*, 487 F.2d 637, 639 (6th Cir. 1973) (defendants could not be sentenced for both conspiracy to possess and conspiracy to distribute heroin when there was obviously a single

agreement between them). *But see United States v. Marotta*, 518 F.2d 681 (9th Cir. 1975) (convictions of conspiring to import and conspiring to distribute did not violate double jeopardy despite fact that they arose from a single chain of events).

In a case still before the Fifth Circuit for a rehearing in banc on the question of whether separate convictions for conspiracy to import and conspiracy to distribute marijuana could stand, a panel has carefully reviewed the concepts of single versus multiple conspiracies. *United States v. Rodriguez*, 585 F.2d 1234, 1247–51 (5th Cir. 1978), *reh. granted*, 585 F.2d at 1252. The panel wrote:

> This court has found, in other contexts, that but a single conspiracy exists even though the agreement that constitutes it has several objectives and aims at the commission of several offenses. It is for this reason that the government need prove only that a conspirator agreed to one of the many objectives charged to hold him liable for the other objectives of the agreement.

> .     .     .     .     .

> As we stated in *United States v. Elliott* [5th Cir.], 571 F.2d [880] at 902, "the precise nature and extent of the conspiracy must be determined by reference to the agreement which embraces and defines its objects. Whether the object of a single agreement is to commit one or many crimes, it is, in either case, that agreement which constitutes the conspiracy which the statute punishes."

> Because one conspiracy may have many illegal objectives, it will necessarily involve a number of sub-agreements to commit each of these specified objectives. Some members may concur in only some of the many objectives, yet they are liable for all because there is but one scheme, one enterprise, one conspiratorial web. If each stitch in that web were treated as a separate conspiracy, infinite bases for liability could be confected. Here, for example, each conspirator might be charged with 16 separate conspiracies to import or distribute with each of the 16 other conspirators; over 200 conspiracies could be charged. Hence, the conspiracy

must be defined as broadly as the reach of vicarious liability.

585 F.2d at 1249–50 (citations omitted). Turning to the two conspiracies before it, the court concluded,

> [t]he two conspiracies were not separate crimes for double jeopardy purposes because they embraced but one ultimate overall goal. The commission, or even the attempted commission, of several offenses constitutes several crimes, but one agreement to violate a number of laws remains but one crime if it is charged merely as a conspiracy and not as a substantive offense.

Feeling constrained by earlier precedent contrary to its logic, the Fifth Circuit panel affirmed the separate sentences for the two conspiracies and a rehearing is now pending. We must agree with the panel's observation that distinguishing between one overall conspiracy and several separate conspiracies is a "frustrating and challenging" task. 585 F.2d at 1251.

Several cases which have compared two conspiracy charges to resolve double jeopardy claims have found the existence of independent conspiracies. In *United States v. Amato*, 367 F.Supp. 547 (S.D.N.Y.1973), the defendants had been twice convicted of conspiracies to steal securities. Although there had been overlapping time periods and common members of the conspiracies, the district court found they were two separate conspiracies. The *Amato* court relied on the language of the indictments and the enumerated overt acts, contrary to many of the holdings cited above, and applied the same evidence test since rejected by several circuits, including our own. *United States v. Inmon*, 568 F.2d 326, 332 (3d Cir. 1977); *United States v. Young*, 503 F.2d 1072, 1075 (3d Cir. 1974); *United States v. Mallah*, 503 F.2d 971, 985 (2d Cir. 1974), *cert. denied* 420 U.S. 995, 95 S.Ct. 1425, 43 L.Ed.2d 671 (1975).

The Tenth Circuit continues to apply the same evidence test to claims of duplicate conspiracies. In *United States v. Martinez*, 562 F.2d 633 (10th Cir. 1977), another case involving narcotics agreements, the circuit

court upheld a finding of two conspiracies. *Martinez* applied the same evidence rationale, compared the overt acts in the two indictments, and—contrary to holdings of the Second, Third, and Fifth Circuits, see pp. 1377–1378, *supra*— placed the burden of persuasion on the double jeopardy issue on the defendants.

Although the Second Circuit has rejected the same evidence test for double jeopardy claims involving conspiracy counts, that court has, while undertaking a thorough factual analysis, distinguished between large, inclusive conspiracies and separate but parallel ones. In *United States v. Papa*, 533 F.2d 815 (2d Cir. 1976), *cert. denied*, 429 U.S. 961, 97 S.Ct. 387, 50 L.Ed.2d 329 (1976), that circuit court examined extensive records of two indictments brought in two different New York district courts. Nothing was uncovered to suggest that one conspiracy was part of the other or that there was an overlap of personnel among the unnamed, unindicted coconspirators. The only overlap, and a "tenuous" connection, was the presence of the defendant in a decisive role in both; moreover, the evidence showed that he had withdrawn from one of them while continuing to operate the other. The court therefore concluded that the defendant was the director of two unrelated conspiracies, each of them a "large-scale free-standing operation." Thus, the normal presumption of interdependence along the vertical chain of a large drug conspiracy was overcome by close analysis of the facts.

Finally, in *United States v. Inmon*, Cr. No. 76–141, *aff'd* 594 F.2d 352 (3d Cir. 1979), we denied the double jeopardy claim of an alleged heroin distributor, finding that a former indictment involved a similar, but separate conspiracy to distribute a different type of drug coming from a different supplier. Thus two conspiracies existed, distinguished by their sources and objectives.

The lesson to be drawn from all these cases is that the double jeopardy analysis must be more carefully made where the two charges involved are conspiracies. This is understandable given the difference between conspiracy and substantive offenses and the fact that the conspiracy concept has grown broadly in modern criminal law. The temporal and spatial dimensions of conspiracy—an intangible agreement—are not easily susceptible of graphic limitation. In one of its most recent pronouncements on the subject, the United States Court of Appeals for the Third Circuit admonished:

> In considering a conspiracy under § 371, a court must be mindful that the statute is a broad one, and that there is a danger that prosecutors may use it arbitrarily to punish activity not properly within the ambit of the federal criminal sanction. Thus, indictments brought under § 371 must be carefully scrutinized.

*United States v. Shoup*, 608 F.2d 955, at 950 (3d Cir. 1979). Another danger, of course, is that a later court reviewing a conspiracy conviction or acquittal will not be able to establish, with any degree of accuracy, the bounds of the agreement which the jury either condemned or vindicated.

Although we will apply the three questions outlined in *Hernandez, supra*, p. 1377,—(1) What were the issues in the two actions? (2) Was the issue in question litigated in the first case? and (3) Was the issue decided in the first case?—we must do so with full knowledge that the conspiracy concept is a vague one which can be easily manipulated by selective review. *United States v. Papa*, 533 F.2d 815, 820 (2d Cir. 1976); *United States v. Young*, 503 F.2d 1072, 1075 (3d Cir. 1974); *United States v. Mallah*, 503 F.2d 971, 985 (2d Cir. 1974), *cert. denied*, 420 U.S. 995, 95 S.Ct. 1425, 43 L.Ed.2d 671 (1975). We feel we must therefore review not only the indictment and verdict in the first case, but also the evidence admitted and the charge to the jury. Our inquiry "must be set in a practical frame and viewed with an eye to all the circumstances of the proceedings." *Ashe v. Swenson*, 397 U.S. at 444, 90 S.Ct. at 1194 (quoting *Sealfon v. United States*, 332 U.S. 575, 579, 68 S.Ct. 70, 92 L.Ed. 341 (1948) ). Finally, because of the high risk of factual manipulation or distortion in comparing conspiracy claims, the burden of proof has been shifted in double jeopardy claims involving conspiracy counts from the defendant to the prosecution. *Inmon, Papa, Mal-*

lah, supra. Thus, as we go through the analysis of the prior case, we must ask whether the government has proved that the conspiracy now charged in the Pittsburgh indictment is NOT the same conspiracy charged in the Cleveland indictment and attempted to be proven at the Cleveland trial.

### Double Jeopardy—Conspiracy—Obscenity

One final word of caution before we begin an analysis of the two actions. Most of the cases we have referred to in the last section of our opinion involved alleged conspiracies to distribute illegal drugs; one involved conspiracies to hijack and steal. In all the cases we have reviewed, the agreement alleged involved a goal that was illegal *per se*. Our case is complicated by the fact that obscenity itself—the alleged objective of the alleged conspiracy—is a nebulous and relative concept. Logically, it would seem that one could not be convicted of a conspiracy to distribute obscene materials until a factual determination that the materials were obscene was established. Conspiracy statutes, however, punish the agreement alone. In *United States v. Feola*, 420 U.S. 671, 95 S.Ct. 1255, 43 L.Ed.2d 541 (1975), the Supreme Court stated that "[t]he law of conspiracy identifies the agreement to engage in a criminal venture as an event of sufficient threat to social order to permit the imposition of criminal sanctions for the agreement alone, plus an overt act in pursuit of it, regardless of whether the crime agreed upon actually is committed." Several cases have held that the government in a conspiracy prosecution need not show that the defendant knew the materials were legally obscene, but only that he knew the nature and character of the materials. *United States v. Hamling*, 481 F.2d 307, 318–319 (9th Cir. 1973), aff'd 418 U.S. 87, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974), *reh. denied*, 419 U.S. 885, 95 S.Ct. 157, 42 L.Ed.2d 129 (1974); *United States v. Friedman*, 506 F.2d 511 (8th Cir. 1975), *cert.*

denied, 421 U.S. 1004, 95 S.Ct. 2407, 44 L.Ed.2d 673 (1975); *United States v. Marks*, 364 F.Supp. 1022, 1027 (E.D.Ky.1973), *aff'd* 520 F.2d 913 (6th Cir. 1975), *rev'd on other grounds*, 430 U.S. 188, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977).

These cases reinforce the notion that what is punished is the agreement itself and not the result. Thus, we must isolate the conspiracy counts in the two actions reviewed from the substantive counts and compare the agreements alleged rather than the ultimate materials objected to by the government as obscene.

Although we do not dispute precedent requiring that the government need only prove than an individual knew the nature of materials to be found guilty of conspiracy to distribute obscene materials, these rulings make our analysis in the present context more difficult. An agreement has been described as a "circle of assent." This is an apt analogy, and the court's role is frequently to circumscribe that circle as best it can, and after the fact. In a conspiracy prosecution the judge or jury must find that parties to the conspiracy intended to agree and also intended to accomplish some unlawful goal or method. *See United States v. United States Gypsum Co.*, 438 U.S. 422, 443 n. 20, 98 S.Ct. 2864, 57 L.Ed.2d 854 (1978). These are intangibles and although the fact of the agreement itself may—and usually must—be inferred, it is another matter to circumscribe the full extent of the agreement. The less specific the law requires the unlawful goal or the terms of the agreement to be, the more difficult it becomes for a court to determine what was decided by an earlier acquittal or conviction of a conspiracy count.

A further complication in our analysis is caused by the concept of "variable obscenity," under which one community applying its standards might find a work obscene while another community might not. Consistent with this concept, but inconsistent with conspiracy law and logic,[3] a single

---

**3.** Because of the variable obscenity concept, commentators have suggested that the conspiracy concept raises unique problems in obscenity prosecutions. See Schauer, *The Law of Obscenity* § 9.8 (1976) cautioning of the "chilling effect" of forum shopping. *Accord*, Mayer, *New Approach to Obscenity—The Conspiracy Doctrine*, 21 St. Louis U.L.J. 366 (1977). *Cf.* Fletcher, *Rethinking Criminal Law* § 3.6 (1979).

agreement to distribute the same material to various locations might easily be carved up into separate conspiracies like slices of a pie, each slice of the agreement radiating out toward a different locale. We specifically do not reach the question of whether such individual charges of conspiracy would violate double jeopardy because here the defendants have argued that the government prosecuted the whole conspiracy in the first case and not a select segment of it. However, we note our concerns for clarity and accuracy in the criminal justice system when two such nebulous concepts as conspiracy and obscenity overlap.[4] In these cases, the conspiracy doctrine, which Judge Learned Hand termed "that darling of the modern prosecutor's nursery," *Harrison v. United States*, 7 F.2d 259, 263 (2d Cir. 1925), may turn out to be an unmanageable illegitimate for the courts.

### The Indictments

The indictment from the Cleveland case has been made part of this record. (It also appears in the Cleveland transcript at 3180). In relevant part it states:

From in or about September, 1973, and continuously thereafter up to and including the date of the filing of this indictment [March 15, 1976], defendants Reuben Sturman, Melvin Kamins, [others], and Sovereign News did in the Northern District of Ohio, Eastern Division and elsewhere wilfully and knowingly conspire, combine, collaborate and agree together and with each other [and with others unknown] to knowingly use the United States mails for the mailing, carriage in the mails, and delivery of obscene, lewd, lascivious and filthy magazines and motion picture films in violation of Sections 1461 & 2, Title 18, United States Code, and to knowingly use and cause to be used common carriers [for the same purpose] all in violation of Section 371, Title 18, United States Code.

.    .    .    .    .

An object of said combination . . . was to profit financially the defendants and others . . .

There follow eight overt acts. All of these involve contact by phone with a bookstore in Fort Worth, Texas or the sending of materials by mail or common carrier from Cleveland to the Fort Worth store. The Pittsburgh indictment is more detailed in its first count, charging in relevant part:

That from on or about the 1st day of January, 1974, through on or about the 18th day of July, 1977, in the Western District of Pennsylvania, and elsewhere, REUBEN STURMAN, MELVIN KAMINS, GREGORY KOCAN, SANDY SCHRAGO, RICHARD JENKINS, and JAMES CALDERONE, the defendants herein, along with . . . unindicted co-conspirators, did wilfully and knowingly combine, conspire, confederate and agree together and with each other, and with other persons whose names at the present are both known and unknown, . . . to knowingly use and cause to be used common carriers for the carriage in interstate commerce of obscene, lewd, lascivious, and filthy magazines and motion picture films, in violation of Title 18, United States Code, Sections 1462 and 2, and to knowingly transport and cause to be transported in interstate commerce for the purpose of sale and distribution, obscene, lewd, lascivious, and filthy magazines and motion picture films, in violation of Title 18, United States Code, Sections 1465 and 2.

It was a part of the conspiracy that the defendants, REUBEN STURMAN, MELVIN KAMINS . . . and others, would occupy premises located [in] Cleveland, Ohio, utilizing the names Sovereign News Company and/or Western Reserve Enterprises, Ltd.

It was further a part of the conspiracy that the [others] would and did occupy premises located . . . in Pittsburgh, Pennsylvania, utilizing the name Majestic News Company.

---

4. *Cf.* Filvaroff, Conspiracy and the First Amendment, 121 Pa.L.Rev. 189, 232–240 (1972).

. . . that the defendants, REUBEN STURMAN, MELVIN KAMINS . . . and others, would and did periodically cause memoranda and instructions to be forwarded from Cleveland, Ohio, to GREGORY KOCAN at the Majestic News Company. . . .

. . . that the defendants, GREGORY KOCAN and RICHARD JENKINS, and others, would and did receive from locations outside the state of Pennsylvania, obscene . . . magazines and motion picture films for the purpose of sale and distribution in the states of Pennsylvania, West Virginia, Ohio and New York.

. . . that the defendants, REUBEN STURMAN, MELVIN KAMINS and GREGORY KOCAN, and others, using the Majestic News Company in Pittsburgh, Pennsylvania, would supply obscene . . . magazines and motion picture films to, and control the activities of the following stores: G & P Co., Inc.; Golden Triangle News Eastern Books, Inc.; L.A.S. Corp.; Market Street News; Mello News; Monroeville News; McKnight Road News; P.N.S. Corp.; and Uptown Book Shop.

. . . that the defendant, REUBEN STURMAN, would cause [an employee] to periodically travel to Pennsylvania and West Virginia for the purpose of inspecting and directing the activities of those ten stores referred to above, and that said employee would thereafter report to REUBEN STURMAN in Cleveland, Ohio.

. . . that the defendants, MELVIN KAMINS and SANDY SCHRAGO, would and did send [an agent] to Pittsburgh, Pennsylvania, for the purpose of assisting the defendant, GREGORY KOCAN, manager of the Majestic News Company.

. . . . .

. . . that the defendant, GREGORY KOCAN, would instruct [an agent] to purchase a vehicle for the purpose of transporting obscene . . . magazines and motion picture films from the Western District of Pennsylvania to the state of West Virginia and elsewhere.

. . . . .

. . . that the defendant, JAMES CALDERONE, would introduce [such agent] to prospective purchasers or distributors of obscene, lewd, lascivious, and filthy magazines and motion picture films.

. . . . .

. . . that [an employee of Majestic] would periodically forward to MELVIN KAMINS copies of sales receipts, which receipts would reflect sales . . to customers in West Virginia and elsewhere . . . and would periodically forward checks drawn on the account of the Majestic News Company to both Western Reserve Enterprises, Ltd. and the Sovereign News Company

. . . . .

An object of the aforesaid combination, conspiracy, confederation, agreement and plan was to profit financially the defendants and others by the interstate shipment and sale of obscene, lewd, lascivious, and filthy magazines and motion picture films.

There follow sixteen overt acts involving the same cast of characters and setting forth specific travels, memoranda and shipments of materials among them.

■ Many courts have warned against placing much weight in the double jeopardy analysis on the language of indictments. There are two reasons for this. One is that indictments must conform to statutes; therefore, the language is general in each indictment and similar among all indictments charging violations of the same statute. The second, and superficially conflicting, reason is that in the conspiracy context the prosecution may select separate manifestations of one conspiracy to multiply indictments. *See Mallah, supra,* 503 F.2d at 985; *Short v. United States,* 91 F.2d 614, 624 (4th Cir. 1937). However, we will consider the indictments as one of the indicia of the conspiracies.

In comparing the two indictments we find similarities and differences. The goals of the conspiracies, to distribute materials and to make money, are the same. The methods, use of interstate mails and carriers, are similar.

The government insisted at oral argument that the two conspiracies alleged involved different parties, different time frames, different situs, and separate acts. The two indictments name a total of fifteen co-conspirators, with only two overlapping. However, both include the Sovereign News Company, the first as a named co-conspirator, the latter as a means of operation for the alleged conspiracy. The first indictment gives no indication of the relative positions within the conspiracy of the named defendants. Reuben Sturman and Melvin Kamins are named on the face of the Cleveland indictment as co-equals with five other individuals and the Sovereign News Company and all seven individual defendants are named as the operatives in each overt act describing a challenged distribution of films or magazines. In the Pittsburgh indictment, the roles of defendants Sturman and Kamins in the alleged conspiracy take on more definite shapes. They are alleged, with one other defendant, to occupy the premises of the Sovereign News Company, to cause *instructions* to be sent to the Majestic News Company, and to supply materials to and *control* the activities of ten other stores. Sturman is alleged to have sent an employee to Pennsylvania and West Virginia to inspect and direct the activities of all the stores and to make periodic reports to Sturman. Kamins likewise is alleged to have sent an employee to Majestic News to assist its manager; he also is alleged to have received sales receipts reflecting sales made in West Virginia. Thus, in the Pittsburgh indictment, Sturman and Kamins occupy a central and authoritarian role in the alleged conspiracy, whereas no distinction in roles was made in the earlier Cleveland indictment.

There is obviously a time overlap in the two indictments, from January 1, 1974 to March 15, 1976, a period of over two years. The period of the Cleveland indictment precedes the period of the Pittsburgh indict-

ment by about three months and the later-charged conspiracy continues beyond the former by about two years. The government argued that the time overlap is not significant, since as we said in *Inmon, supra,* two parallel conspiracies may exist at the same time. If the time periods were identical or if there were a large gap of time between the two conspiracies, we might accord the time element more weight. *But see United States v. Kissel,* 218 U.S. 601, 31 S.Ct. 124, 54 L.Ed. 1168 (1910) (it is the nature of the agreement rather than the time frame which controls the question of single or separate conspiracy); *United States v. Palermo,* 410 F.2d 468 (7th Cir. 1969) *reh. en banc denied; Short v. United States,* 91 F.2d 614 (4th Cir. 1937). Where the period of time overlapped in the indictments is approximately the same as that time exclusive to both of them, we find the time element to be of very limited usefulness. The only fact we can draw from the indictments is that the manifestations of alleged conspiracies were occurring in roughly the same years.

Likewise, the government's contention that each conspiracy involves a different situs adds little to its position. The Cleveland indictment specifies overt acts in Cleveland and Fort Worth while the Pittsburgh indictment specifies overt acts in Cleveland, Pennsylvania, and West Virginia. In both indictments, the source of the allegedly illegal distributions was the Sovereign News Company in Cleveland. The first indictment indicates a one way flow of materials from Cleveland to Fort Worth; the latter, a radiating flow of materials, instructions, and supervision from Cleveland to various locations in Pennsylvania and West Virginia. We cannot establish a situs for the agreement itself from the face of the Cleveland or Pittsburgh indictment; however, it can be inferred from the latter that control of the alleged conspiracy emanated from Cleveland.

Finally the government argues that the presence of different acts in both cases precludes any double jeopardy problem. We have earlier noted the reluctance to rely on overt acts. So long as it is the agreement

that is condemned and prosecuted, it is that agreement which must differ from case to case. The government argues for a finding of distinct conspiracies radiating from a central location in Cleveland and attempts to buttress that argument by referring to overt acts occurring in separate geographical locations at the ends of spokes. The defendants attempt to enclose the circle by including each of the spokes within it, all as part of one ongoing and continuous agreement between them to operate a large-scale enterprise. Since the overt acts selectively reflect the agreement, we must look to the evidence produced at the first trial to determine whether two separate agreements were in existence.

### Proof at the Cleveland Trial

■ We have reviewed with care the over 3400 pages of the Cleveland trial transcript. We limit our review now to the conspiracy count. The defendants have urged us to rely on the arguments of the prosecution during that trial to determine the extent of the conspiracy sought to be proven to the jury. Although we have considered those arguments, both to the court and jury, as part of the totality of circumstances in the first case, we have given more weight to the evidence presented and admitted by the Court, the Court's rulings as to the conspiracy count, and the Court's instruction to the jury. We believe that the evidence presented and the legal ruling provide the factual and legal framework for the jury's final determination. Through the evidence that the government offers it attempts to establish what it believes to be the scope of conspiracy, and also defines for double jeopardy purposes what it may not again attempt to prove. *Short v. United States,* 91 F.2d 614, 624 (4th Cir. 1937); *cf., United States v. Palermo,* 410 F.2d 468 (7th Cir. 1969). Of course, as we have earlier noted, the strict "same evidence" test for double jeopardy purposes has fallen into disrepute. The question here is not whether the government would produce the same evidence at the second trial, but rather, what was the extent of the agreement established at the earlier trial.

The opening statement of the government, although brief, set the stage for the evidence to be offered. After naming the defendants, the prosecutor argued to the jury that he would prove that "Sturman in fact controls the Sovereign News Agency," that "Kamins is his Chief Assistant" and that "the business of the Sovereign News Company consisted exclusively in the interstate shipment on a large scale of pornographic material, films, magazines, and other publications." (T. A6) He then went on to detail the substantive counts, returning to the conspiracy count to explain that the defendants were charged with "planning and scheming to do the things I have just mentioned [shipping obscene materials] not only by making shipments to Webster's Bookstore in Fort Worth, Texas, but by making shipments to numerous other places throughout the country." (T. A9; *see also* T. A17–18). To support the conspiracy charge, he told the jury, various business documents and other materials which were seized in searches of the Sovereign News Company premises would be offered into evidence (T. A17).

And they were. Over the objections of the defendants, the Court ruled early in the trial that allegedly obscene materials other than those specified in the substantive counts could be admitted into evidence to prove the conspiracy (T. 102–30 to 102–34; 364; 751; 850). These materials had been seized from Sovereign's warehouse in Cleveland (Ibid.). One of the earliest disputes over evidence involved the government's attempt to introduce bank account records and statements of Sturman personally and of the Sovereign News Company, some of them carrying balances in five and six figures (T. 447–522). The prosecutor argued that the corporate account of Sovereign News was of significance "particularly in view of the scope of the conspiracy count in this indictment, charging that it was part of the plan and scheme to ship obscene material to numerous destinations throughout the United States . . . that there were extensive shipments throughout the country . . . [These amounts] reflect that they were doing a large volume of business and

collecting on these shipments that they were sending out to various places" (T. 506). The Court admitted the corporate account into evidence, ruling that "Sovereign News is one of the named conspirators, and the amounts of monies involved certainly are relevant to this charge" (T. 511). Moreover, the Court admitted two accounts of Sturman (T. 513–14) and an account representing an employee profit-sharing plan because it showed that defendant Kamins held a "high position of trust in this so-called inner group" (T. 511, 544–45). These documents were admitted into evidence during the testimony of an officer of the Federal Deposit Insurance Corporation (T. 530–60).

Many other business records were obtained pursuant to court-authorized search warrants for the Sovereign News premises and were identified by the FBI agents and postal inspectors who conducted the searches. Included were a shipping ledger showing shipments of materials by name and quantity to specific destinations throughout the United States (T. 574–82); invoices naming certain magazines not in evidence but in the same series or by the same producer as others admitted into evidence from which the Court inferred that they were of the same general nature (T. 667–68, 682–84); numerous interoffice memoranda relating to the operation of Sovereign News and its relationship to other agencies (T. 607–08, 671–79, 689–90); even minutes of meetings of one of the bookstores (T. 749–41). One FBI agent who participated in two searches testified that his specific assignment was "to obtain accounts receivable for certain alleged subsidiaries of Sovereign News Company" (T. 700). He identified invoices for shipment of materials not in evidence to eight widely scattered locations including Majestic News in Pittsburgh (T. 706–09). Another agent testified that he seized certain magazines in a warehouse area containing hundreds of boxes of magazines (T. 764–65); he identified by title specific magazines he had seized that were not included in the substantive counts of the indictment (T. 767–77; see also T. 804–06, 855–59 979–84) and read from receiving forms the titles and quantities of similar magazines purchased by Sovereign News (T. 778–80).

Two other agents were in charge of seizing films. One stated that there were hundreds of reels of films on the premises and identified several of the films seized that were not involved in the transactions alleged in the indictment (T. 784–89). The other identified more films and business records showing films shipped to one of the alleged subsidiaries (T. 792–98). Still other agents testified about letters referring to the "combined Sturman agencies" (T. 820), accounts receivable ledgers for 1974 and 1975 enumerating nine separate bookstores including Majestic News (T. 915–17), and invoices for the same stores (T. 919–20).

Employees of Sovereign News were called to testify about the business' operations. It was established that Sturman ran the day-to-day operations and that Kamins was his assistant and general manager (T. 1015, 1076, 1114, 1368–69, 1404–05); that an enterprise called "Western Reserve Enterprises" occupied the same premises as Sovereign and was run by Sturman (T. 1067, 1403); that Sturman and Kamins directed the business of nine or ten bookstores in various locations in the United States, even reimbursing their legal fees in some cases (T. 1127–31, 1136–39, 1168, 1488); that Majestic News in Pittsburgh was one of these bookstores or "subsidiary companies" (T. 1131–36); that Sovereign employed salesmen who travelled throughout the United States selling sexually-oriented books and magazines (T. 1367–68, 1372–73, 1404). Employees of some bookstores not involved in the substantive counts were called and testified of the close connection of defendants Sturman and/or Kamins to the operations of the bookstores (T. 1444–1450, 1468–70, 1485, 1509, 1522–23.) There was also evidence of Sturman's financial interest in the various stores (T. 1568–78) including Majestic News (T. 1575). Finally, there was evidence that some of the bookstores controlled their own satellite stores (T. 1522).

Most comprehensive was the testimony of the government's final fact witness, the FBI agent in charge of the Sovereign News searches. He introduced letters and other documents showing that Sovereign worked

closely with, and had complicated financial dealings with, domestic and foreign publishers and film-makers (T. 1809–20); some of these referred to materials that were neither charged in the indictment nor offered into evidence. He testified from documents seized that specific titles named in the indictment were shipped to several stores other than the Fort Worth store (T. 1854–1862), including Majestic News in Pittsburgh (T. 1859).

The defendants in the Cleveland case objected repeatedly to the nature and amount of evidence being offered, asserting that it went beyond the scope of the conspiracy charged in the indictment or that they could not ascertain the scope of the crime against which they must defend. (*See, e. g.*, T. 102–23, 114–15, 446, 631, 634–35, 668, 681–83, 730–32, 748–49, 847, 889–90, 1252–53, 1270–71, 1287–88, 1423–26, 1445, 1510–11, 1567, 1759). The prosecution insisted that the evidence of the business structure of the Sovereign News Company, the sources of its materials and its sales outlets were all relevant to establish the scope of the conspiracy. *See, e. g.*, T. 506, 733, 750, 1044, 1255, 1262–65, 1368–72, 1400–07, 1563–73, 1611–17, 1697, 1830–38; the extent of the evidence offered is best demonstrated at 1092, 1180–99, 1400–07, 1450, 1474, 1483–84, 1512–13, 1537–38, 1546, 1830–38, 2766–67, 2780). It made clear before the Court's ultimate ruling on admissibility of evidence of the conspiracy that it was not simply charging a conspiracy to ship the allegedly obscene materials to Fort Worth, Texas (T. 1697, 1611–12, 1617, 1736–39). The Court's rulings reflect the belief that the government had charged and was proving a large and ongoing conspiracy, headed by Sturman and Kamins, and involving the interstate shipment of similar materials throughout the United States *(See, e. g.*, T. 668–69, 734, 746, 751, 754, 850–51, 1139, 1254, 1260–63, 1474, 1512–13, 1537, 1602–03, 1607–17).

The Court's ultimate ruling on what would be admissible to establish the conspiracy is significant:

> Bearing all in mind the evidence shows through invoices and other business records of The Sovereign News Company that sexually explicit magazines and films are being purchased through the channels of interstate and foreign commerce and are being sold and mailed or shipped by common carrier to agency companies of Sovereign News located in principal cities of this country. These include Chicago, Buffalo, Boston, Philadelphia, Milwaukee, Pittsburgh, Baltimore and Denver. These agency companies, actually part of the Sovereign News operation, in turn resell these magazines and films to local retailers. . . . on the evidence now presented, it is determined that the principal, if not the exclusive business of Sovereign News, is to purchase and sell sexually explicit magazines and films, using the channels of interstate and foreign commerce.

> .    .    .    .    .

> Of course it is not necessary to establish an express agreement as American Tobacco Company indicates. From the very fact that the defendants are working together at Sovereign News, each performing a particular function, the necessary agreement or combination to accomplish the purchase, sale and distribution of sexually explicit magazines and films may be and is inferred.

> .    .    .    .    .

> Previously summarized, the evidence in this case shows large-scale interstate and foreign dealings in such material, and none of the magazines and films introduced as evidence or viewed by the court have been other than of a sexually explicit character. There has also been unrebutted evidence from which it may be inferred and the court finds that each one of the defendants was fully aware of the character and nature of the materials in which, according to the evidence offered in this courtroom, Sovereign News then dealt exclusively.

> From the fact that the exclusive business of Sovereign News is the distribution and sale of sexually explicit materials in interstate commerce, as well as the receipt of these materials, some of them from foreign commerce, and because each defendant performed a different but key

position in the business of Sovereign News, it may be inferred, and this Court finds, that each defendant knew the sexually explicit nature and character of these materials that were being mailed or shipped in interstate or foreign commerce.

. . . . . .

The defendants in this case may not have known the times and places of all shipments from Sovereign News, but they did know that shipments of sexually explicit matter were constantly being made by the company.

(T. 1788–1801).

### The Jury Charge and Verdict

Several of the cases cited in the double jeopardy section of this opinion recommend examining the judge's charge to the jury in establishing the issues resolved by an earlier trial. The Cleveland charge included the standard black-letter definitions of conspiracy and overt acts (T. 3184–87). The Court instructed that three elements would have to be proven to establish that an individual defendant unlawfully conspired: (1) that from September, 1973 to March, 1976, "through and by means of the business known as Sovereign News Company and by using United States mails and interstate common carriers, the individual defendants agreed and conspired together to buy and to sell and distribute magazines and films that in fact were obscene" (T. 3187–88); (2) that the defendant willfully participated in the conspiracy with the specific intent to violate federal obscenity laws—such intent being established by actual knowledge that shipments of sexually explicit films or by knowledge that shipments of sexually explicit materials were constantly being made by Sovereign News (T. 3193–96); and (3) that one or more of the defendants knowingly and willfully committed one of the overt acts. (T. 3197). Summarizing count one, the Court concluded:

Should the jury find with reference to the particular defendant under considera-

tion that the United States by evidence beyond a reasonable doubt has failed to prove the three-prong test of obscenity or has failed to prove any one or more of the three essential elements of the crime of conspiracy, as charged in the first count of the indictment, as I have defined the law of conspiracy, and as I have explained these three elements, you will then return a verdict of not guilty as to that particular defendant.

But, as to the particular defendant under consideration, should the jury find that the United States, by evidence beyond a reasonable doubt, has proved all three prongs of the test of obscenity and has proved all three essential elements of the crime of conspiracy, charged in the first count of the indictment, as I have defined the law of conspiracy, and as I have explained these three elements, you will then return a verdict of guilty as to Count I—the conspiracy count—against the particular defendant under consideration.

Had the jury returned a verdict of guilty on count one, it would be easy to identify the issues that the jury resolved against the defendants; it necessarily would have been all of those included in the charge. However, after five days of deliberations, the jury returned a general verdict of not guilty on the conspiracy count. Thus it is impossible for this Court to establish with certainty what the jury decided in regard to each of the elements the Court had outlined.[5]

### Conclusion

Reviewing the extensive evidence submitted to the jury—although it is impossible for this Court to circumscribe with accuracy the exact boundaries of the conspiracy of which the defendants were acquitted—it is clear that the government attempted to prove a far-reaching agreement. As the Court noted in its rulings, it was established that Sturman and Kamins ran a very large-

---

5. We have noted in reviewing the transcript that the jury expressed its dismay at application of the legal definition of obscenity (T. 3445–48). However, especially in light of the

long period of deliberations, we cannot speculate on the bases for the jury's verdict. *See Jones v. Blankenship,* 458 F.Supp. 521, 524–25 (W.D.Va.1978).

scale enterprise that was continuously involved in receiving and distributing magazines and films of an explicitly sexual content. This conspiracy involved an agreement among these two individuals and others to profit financially from the continued business of dealing in materials of the same or similar nature.

Given the nature of the enterprise, it is difficult to superimpose a time constraint on the agreement involved. We think that in reality there were many small and separate agreements in the course of running the business—agreements on individual orders or shipments of materials, for example. However, it is also apparent that these small agreements or decisions were subsumed under one larger agreement between these two individuals to operate this business. Various divisions or aggregates of activity might logically be made; however, the government in the Cleveland case did not clearly or carefully specify a range of activity as the extent of the conspiracy.

It is very clear, as the prosecutor himself noted, "that this conspiracy is more broadly drawn than three shipments to Webster Bookstore in Texas" (T. 1736; 2778–2790). We know also that the agreement was alleged to have been in effect during the years 1973 through 1976 (although there was proof that the business had been in operation at least ten years), that it was headed by Sturman and Kamins, and that its objective was the sending of magazines and films to various places throughout the country, many of them closely aligned with the corporate headquarters and one of them being Majestic News. The indictment in the current case, by its indication of the positions Sturman and Kamins held in the alleged scheme, mirrors the proof at the first trial.

██ The nature and scope of the agreement established at the first trial was indeed expansive; it was also *indefinite* in its dimensions. The burden is on the government, as *Inmon* and *Papa* instruct, to establish that the conspiracy now charged is not the same conspiracy as that for which the defendants were previously tried. The government has not established, nor from our independent review of the trial transcript can we conclude, that the conspiracy which is currently alleged was not within the ambit of the conspiracy attempted to be proved at the Cleveland trial. This is especially true where there are nebulous overlappings of time, place, personnel, and purpose.

The Second Circuit has offered an excellent metaphor for the proving of conspiracies, recalling the age-old tale of blind men describing an elephant from touch. *United States v. Mallah*, 503 F.2d at 987. The lesson, of course, is that selective description is misleading and can arbitrarily divide one object into many. Here, however, it appears that the government brought the entire beast into court during the first trial and now attempts to dismember it.

We do not agree with the statement of defense counsel at oral argument that the government, once having prosecuted this business enterprise, is *forever* precluded from again charging that it harbored a conspiracy to violate the obscenity laws. The double jeopardy question would have to be faced separately at each prosecution, and the passage of time or changes in other elements might be crucial.

Nor do we hold that the government would necessarily be foreclosed from pursuing the instant conspiracy charge had the Cleveland trial been specifically limited to a narrow agreement to ship materials to Fort Worth,[6] and had such a narrow agreement been proved.

Our decision is limited to a comparison of the current indictment with the Cleveland indictment and trial[7] and the inescapable conclusion that the agreement alleged and

---

**6.** *But see United States v. Mallah*, 503 F.2d 971, 985 (2d Cir. 1974), *cert. denied*, 420 U.S. 995, 95 S.Ct. 1425, 43 L.Ed.2d 671 (1975) (quoting *Short v. United States*, 91 F.2d 614, 624 (4th Cir. 1937)); *United States v. Palermo*, 410 F.2d 468 (7th Cir. 1969); *United States v. Cohen*, 197 F.2d 26 (3d Cir. 1952).

**7.** The grand jury proceedings in the instant case were submitted for this Court's *in camera* inspection. Although we do not rely on those materials, we believe they support rather than refute our conclusion.

established at the prior trial was broad enough to encompass the agreement alleged here. While the issues raised in the two conspiracy counts are not identical or congruent, they are sufficiently similar and overlapping to raise the double jeopardy bar to reprosecution. Applying the *Hernandez* formula, see p. 1377 *supra,* the material issue raised here is very close to that raised before. It was litigated fully in the first trial, and was resolved by the general verdict of acquittal. The government has failed to rebut the claim of double jeopardy by showing that the second agreement is separate and distinct, as the government is required to do under the Third Circuit's opinion in *Inmon.*

Count one must therefore be dismissed as to Sturman and Kamins.